UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| LANDMARK TRUCKING, LLC, and LANDMARK FORWARD COMPANIES, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BERKSHIRE HATHAWAY HOMESTATE INSURANCE COMPANY, and HANOVER INSURANCE GROUP,[1]<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [19] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:24-cv-00708-DBB-JCB<br><br>District Judge David Barlow |

Before the court is Defendant Berkshire Hathaway Homestate Insurance Company's ("Berkshire") Motion for Summary Judgment.[2] Berkshire moves for summary judgment against Plaintiffs Landmark Trucking, LLC and Landmark Forward Companies, LLC ("Landmark") on their breach of contract claim, which includes breach of the implied covenant of good faith and fair dealing, and their contract reformation claim.[3] For the reasons below, the court grants Berkshire's motion.[4]

---

[1] The Complaint, ECF No. 1-3, filed Sept. 25, 2024, and Def. Berkshire Hathaway Homestate Ins. Co.'s Mot. for Summ. J. ("Motion"), ECF No. 19, filed Nov. 25, 2025, improperly list "Hannover Insurance Group" as a defendant. Hanover Insurance Company is the correct underwriting entity that issued one of the relevant policies at issue. *See* Notice of Removal 1 n.1, ECF No. 1, filed Sept. 25, 2024. Hanover Insurance Group is a registered service mark. *See* ECF No. 1, Ex. B.

[2] *See generally* Motion.

[3] *Id.* at 1–2.

[4] Having reviewed the briefing and relevant law, the court finds that oral argument would not materially assist in resolving the matter. *See* DUCivR 7-1(g).

## UNDISPUTED MATERIAL FACTS[5]

On July 19, 2023, a Landmark-owned truck with a flatbed trailer was transporting an excavator on a freeway when the excavator hit an overpass bridge, causing damage to the excavator and the bridge.[6] Debris from the collision struck an oncoming vehicle.[7]

At the time of the accident, Landmark's truck was covered under a motor vehicle insurance policy ("the Policy") issued by Berkshire.[8] Under the Policy, Landmark's deductible is $10,000 and the liability limit is $100,000.[9] The Policy's Business Auto Coverage Form describes coverage, in relevant part, as follows:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered "auto."[10]
>
> ….
>
> We will pay for "loss" to a covered "auto" or its equipment under . . . [t]he covered "auto's" collision with another object.[11]

The Policy defines an "auto" as follows:

> 1.    [a] land motor vehicle, "trailer" or semi-trailer designed for travel on public roads; or

---

[5] For purposes of this memorandum decision, the court has drawn from the list of undisputed facts offered in the Motion, Opposition, and Reply. The parties' briefing also included some purported undisputed material facts that are not included here because they are not material to the resolution of the motions, were not supported by the cited evidence, or were considered to be argumentative statements and not statements of facts.

[6] Police Report 2–3 ("Ex. 1"), ECF 19-1, filed Nov. 25, 2025; Pl.'s Opp'n to Mot. for Summ. J. ("Opp'n") 1, ECF No. 23, filed Dec. 26, 2025.

[7] Ex. 1 at 2–3; Motion 3. The third-party claims for damage to the oncoming vehicle and claims by the State of Utah for damage to the bridge are not at issue in this lawsuit. *See* Motion 2–3, n.1.

[8] Motion 3; Compl. ¶ 22; Ex. 2, Berkshire Policy No. 02TRM053438-01 ("Policy"). Landmark's flatbed trailer was covered, at the time of the accident, by a separate insurance policy issued by Defendant Hanover Insurance Company ("Hanover"). That policy is not at issue in Berkshire's Motion. *See* Motion ¶ 13; Compl. ¶ 3; n.1.

[9] Policy 53.

[10] *Id.* at 19 (Policy's Business Auto Coverage Form, Section II.A).

[11] *Id.* at 23 (Section III.A of the Business Auto Coverage Form).

2.      [a]ny other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment."[12]

The Policy defines "mobile equipment" as "any of the following types of land vehicles, including any attached machinery or equipment," including "[b]ulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads."[13]

The Policy also includes coverage for cargo, which is defined in the Policy as "property of others which is in your custody while loaded for shipment in or on a covered 'auto.'"[14] The introduction to the Policy's Cargo Coverage Form states that "[v]arious provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered."[15] One such provision within the Cargo Coverage Form is the coinsurance provision:

a.  If the Cargo Limit of Insurance shown in the Schedule of Coverage is 80% or more of the actual cash value of the "cargo" at the time of "loss", we will pay the full value of the "loss" up to the Cargo Limit of Insurance.

b.  If the Cargo Limit of Insurance shown in the Schedule of Coverage is less than 80% of the actual cash value of the "cargo" at the time of "loss", we will pay only a percentage share of the "loss". We will determine the most we will pay using the following steps:

> Step 1: Multiply the actual cash value of the "cargo" at the time of "loss" by 0.80;
> Step 2: Divide the Cargo Limit of Insurance shown in the Schedule of Coverage by the figure determined in Step 1;
> Step 3: Multiply the total amount of "loss", before the application of any deductible, by the figure determined in Step 2; and
> Step 4: Subtract the deductible from the figure determined in Step 3.

---

[12] *Id.* at 27 (Section V.B. of the Business Auto Coverage Form).
[13] *Id.* at 28 (Section V.K of the Business Auto Coverage Form).
[14] *Id.* at 55, 63 (Section II.D.2 of the Cargo Coverage Form).
[15] *Id.* at 55.

> We will pay the amount determined in Step 4 or the Cargo Limit of Insurance shown in the Schedule of Coverage, whichever is less.[16]

The Policy indicates that in the event of cargo loss, the insured "must give us or our authorized representative prompt notice of 'loss'" and the insured "must not assume any obligation, make any payment, or incur any expense without our consent, except at your own cost."[17] The loss mitigation limit is $5,000.[18]

### *Procedural Posture*

Berkshire received notice of the July 19, 2023 accident's claim from Landmark that same day.[19] The following day, Berkshire began the process of obtaining appraisals and values related to the excavator's damage from an independent adjuster.[20] Mammoth Machinery ("Mammoth"), the company that handles rentals of the excavator, asserted a third-party claim against the Policy for the damage to the excavator.[21] At the end of July, Landmark began paying rental expenses for the excavator while it was being repaired and incurred a total rental cost of $55,448.20.[22]

On August 21, 2023, the independent adjuster provided Berkshire an initial report but did not finish an appraisal on the excavator until October 10, 2023.[23] On October 19, 2023, Berkshire obtained a final appraisal to repair the excavator at an estimated cost of $73,103.59.[24] The report's inclusion of the excavator's purchase price—$419,634.37—flagged the possibility

---

[16] *Id.* at 59–60 (Section II.D.2 of the Cargo Coverage Form). *See also id.* at 53 (Supp. Decl.–Cargo Coverage) (showing the deductible for cargo as $10,000).
[17] *Id.* at 59 (Section III.A.2 of Cargo Coverage Form).
[18] *Id.* at 53 (Supplemental Declarations – Cargo Coverage).
[19] Motion ¶¶ 14–15.
[20] *Id.* ¶¶ 17–21.
[21] *Id.* ¶¶ 4, 16; Ex. 4 (Berkshire's Claim Notes) at 85–88, ECF No. 19-1, filed Nov. 25, 2025.
[22] Compl. ¶ 26; Opp'n ¶¶ 2, 8. *See also* Ex. 4 at 88 ("Rental agreement for the excavator: This is a Subrent Agreement between SCAMP Excavations and Mammoth Machinery LLC.").
[23] Motion ¶¶ 17–18, Ex. 4 at 87–88.
[24] Ex. 4 at 87.

of a coinsurance penalty.[25] The following week, Berkshire obtained a market survey valuation of the excavator, which showed its value on the day of loss (July 19, 2023) at $397,778.33, and confirmed the applicability of the coinsurance provision.[26] The same day Berkshire received the valuation, it notified Landmark that the coinsurance penalty applied because the Policy's cargo coverage limit of $100,000 was less than 80% of the cargo's actual cash value on the date of loss.[27] According to the Policy's coinsurance formula, the available coverage was $12,662.11.[28]

On November 14, 2023, Berkshire emailed a settlement offer to Mammoth for $12,662.11 with an explanation about the coverage amount and notified Landmark of the offer.[29] Mammoth rejected the settlement.[30] In the ensuing email exchange between the parties over the following months, Berkshire learned that Landmark had paid Mammoth for the excavator's damages and subsequently offered the $12,662.11 to Landmark.[31]

In December 2023, Berkshire continued to coordinate coverage with Hanover while the independent adjuster was in communication with Mammoth.[32] In January 2024, UDOT notified Berkshire they had received the bid for the bridge's repairs, and the excavator was repaired near the end of the month.[33]

---

[25] Motion ¶ 20.
[26] *Id.* ¶ 21.
[27] *Id.* ¶¶ 21–22, 10; Policy 59–60 (Section II.D.2 of the Cargo Coverage Form).
[28] Motion ¶ 22; Policy 17. *See also* Ex. 5 (October 26, 2023 Letter) ("The claim presented is $73,103.59. You are required to carry 80% of the value of the load or $318,222.66. Taking the amount you carried ($100,000) divided by the amount required ($318,222.66) is 31% of value. Therefore, applying 31% of the damages presented we would owe $22,662.11 less than the applicable cargo deductible of $10,000 or $12,662.11.").
[29] Motion ¶¶ 23–24; Ex. 4 at 6.
[30] *Id.* 11.
[31] *Id.* ¶¶ 26–30.
[32] Ex. 4 at 83.
[33] Ex. 4 at 82; Opp'n ¶ 11, Ex. 2 (Excavator Repair Invoices), ECF 23-2, filed Dec. 26, 2025.

Landmark filed a complaint in the Fourth Judicial District of Utah to recover the cost of repairs and rental expenses in the amount of $123,610.06.[34] The case was removed to federal court.[35]

## STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[36] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[37] In determining whether there is a genuine dispute as to material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[38]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[39]

## DISCUSSION

Berkshire seeks summary judgment on Landmark's breach of contract and contract reformation claims on the basis that Landmark failed to establish breach and mistake.

---

[34] *See generally* Compl.
[35] *See generally* Notice of Removal.
[36] Fed. R. Civ. P. 56(a).
[37] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).
[38] *Id.*
[39] *Id.* at 670–71.

## I.      Breach of Contract

To prevail on a breach of contract claim under Utah law,[40] a plaintiff must establish "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[41] A plaintiff must prove each element to succeed on the claim.[42]

"Insurance policies are contracts between the insurer and the insured and must be analyzed according to principles of contract interpretation under Utah law."[43] Courts "interpret words in insurance policies according to their usually accepted meanings and in light of the insurance policy as a whole."[44] "[I]t is axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms, which terms should be given effect if it is possible to do so."[45] Furthermore, courts "construe insurance contracts by considering their meaning to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy."[46]

Here, Landmark asserts Berkshire has breached the terms of the Policy and the implied covenant of good faith and fair dealing by failing to pay the entire cargo limits.[47] Landmark also

---

[40] "[W]hen, as here, a federal court is exercising diversity jurisdiction, it must apply the substantive law of the forum state." *Dyno Nobel v. Steadfast Ins. Co.*, 85 F.4th 1018, 1025 (10th Cir. 2023) (citation omitted). Accordingly, the court applies Utah law.

[41] *Accesslex Inst. v. Philpot*, 2023 UT App 21, ¶ 25, 526 P.3d 1282 (quoting *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224).

[42] *See, e.g.*, *Smith v. St. Paul Fire & Marine Ins. Co.*, No. 95-3370, 1996 WL 580020, at *2 (10th Cir. 1996) ("Plaintiff is required to prove all elements of his claim; failure to demonstrate one element defeats the action.").

[43] *Compton v. Houston Cas. Co.*, 2017 UT 17, ¶ 17, 393 P.3d 305 (quoting *Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, 2012 UT 1, ¶ 16, 268 P.3d 180).

[44] *Dyno Nobel*, 85 F.4th at 1026 (quoting *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 686 (Utah 1999)).

[45] *Brigham Young Univ. v. Lumbermens Mut. Cas. Co.*, 965 F.2d 830, 835 (10th Cir. 1992) (quoting *LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988)).

[46] *Compton*, 2017 UT 17, ¶ 17 (internal quotation marks and citation omitted).

[47] Opp'n 13.

alleges Berkshire is in breach by failing to promptly investigate and process its claim, by delaying approval of repairs, and by failing to effectively communicate regarding the claim's status.[48] Berkshire denies these claims and contends that Landmark is not entitled to the amount it seeks under the Policy's terms.[49]

### A.    Alleged Failure to Provide Required Coverage

Under the plain language of the Policy, Landmark cannot establish that Berkshire is in breach for not paying $55,448.20 in rental expenses and $68,161.86 in repairs to the excavator, for a total of $123,610.06.[50] The court addresses each category of costs in turn.

### 1.    Rental Expenses

First, the $55,448.20 Landmark seeks for rental costs it incurred while the excavator was being repaired is considered a loss mitigation cost under the Policy.[51] As such, the amount is subject to the Policy's $5,000 limit on mitigation costs and by the Policy's restriction that "in the event of cargo loss," the insured "must not assume any obligation, make any payment, or incur any expense without [Berkshire's] consent, except at [the insured's] own cost."[52] Landmark does not address the $5,000 limit on mitigation costs but argues the restriction does not apply because it had the obligation to Mammoth pay for the excavator with or without the rental agreement.[53]

For support, Landmark cites *Castillo v. Atlanta Casualty Company* for the proposition that "the right to compensation for loss of use of a vehicle does not hinge upon the owner having

---

[48] Opp'n 13. *See id.* ("Essentially, the breaches are split into a failure to provide required coverage and a failure to process [Landmark's] claim promptly . . . .").
[49] Motion 2.
[50] Compl. ¶¶ 25–28, 49.
[51] Motion 8–9.
[52] Policy 53, 59.
[53] Opp'n 17.

actually rented a replacement."[54] Landmark's reliance on *Castillo* is misplaced because the rental costs here are associated with loss of cargo, not loss of an auto, and the two are not interchangeable under the Policy in this case.[55] In fact, the terms are separately defined and subject to provisions in separate coverage forms—the Business Auto Coverage Form and the Cargo Coverage Form.[56] Furthermore, the *Castillo* case did not consider the applicability of a contractual provision that required the insurer's consent before incurring an obligation such as the rental agreement.[57]

Here, the Policy states that in the event of cargo loss, the insured "must give [Berkshire] or our authorized representative prompt notice of 'loss'" and the insured "must not assume any obligation, make any payment, or incur any expense without our consent, except at your [the insured's] own cost."[58] Granted, the evidence clearly shows that Landmark promptly notified Berkshire of the excavator's damage, but it does not show that Landmark obtained consent from Berkshire before making rental payments or incurring expense related to mitigation.

Landmark argues it did not "assume" the obligation to pay for the excavator because that obligation already existed by the time of the accident. However, Landmark provides no evidence of that obligation. To the contrary, the evidence shows that while Berkshire was aware of a rental agreement on July 28, 2023, it was one of the excavator's owners, not Landmark, who notified

---

[54] *Castillo v. Atlanta Cas. Co.*, 939 P.2d 1204, 1209 (Utah Ct. App. 1997).

[55] *Compare* Business Auto Coverage Form *with* Cargo Coverage Form. *See* Policy 18, 55. *See also Monarch Casino & Resort, Inc. v. Affiliated FM Ins. Co.*, 85 F.4th 1034, 1043 (10th Cir. 2023) (stating that because two terms in a policy have "different meaning[s,] . . . [t]hey are not synonymous.") (applying Colo. law).

[56] The Policy's definition of an "'auto' does not include 'mobile equipment,'" and it defines "cargo" as "property of others which is in your custody while loaded for shipment in or on a covered 'auto.'" *See* Policy 27, 55, 63.

[56] *See id*.

[57] *See Castillo*, 939 P.2d at 1205–07.

[58] *Id.* at 59 (Section III.A.2 of Cargo Coverage Form).

Berkshire of its existence, noting he was "not sure if the insured was renting the excavator or if the insured was hauling it as cargo."[59] The evidence then shows that Berkshire learned that the "Rental agreement for the excavator . . . is a Subrent Agreement between SCAMP Excavations and Mammoth Machinery LLC."[60] Thus, the evidence does not support Landmark's position.

Alternatively, Landmark argues that even if its rental agreement violates the Policy, Berkshire has not shown that the breach was material and that question should not be resolved on summary judgment.[61] Citing *Arlington Management Associates, Inc. v. Urology Clinic of Utah Valley, LLC*, Landmark argues that "whether 'a party performed under a contract or breached a contract is a question of fact.'"[62] However, "although materiality is typically resolved by the jury, summary judgment is appropriate where no reasonable jury could disagree."[63] Here, no reasonable jury could disagree where the $55,448.20 Landmark seeks is precluded by both the $5,000 mitigation cost limit and the restriction on entering into obligations without Berkshire's consent. In sum, Berkshire's refusal to pay $55,448.20 in rental expenses is not a breach of the Policy.

### 2.    Repair Costs

Likewise, the $68,161.86 for the excavator's repairs exceeds what the Policy allows under the coinsurance provision that limits recovery amounts on cargo losses. "Coinsurance is a

---

[59] Ex. 4 at 89.

[60] *Id.* at 88.

[61] Opp'n 17.

[62] *Arlington Mgmt. Assocs., Inc. v. Urology Clinic of Utah Valley, LLC*, 2021 UT App 72, ¶ 13, 496 P.3d 719 (quoting *iDrive Logistics LLC v. IntegraCore LLC*, 2018 UT App 40, ¶ 43, 424 P.3d 970).

[63] *Larada Scis. v. Pediatric Hair Sols.*, 2:18-cv-00551, 2023 WL 6609492, at *4 n.67 (D. Utah Oct. 10, 2023) (citing *Arlington Mgmt. Assocs., Inc.*, 2021 UT App 72, ¶ 16).

method used to divide the risk of loss between the insurer and the insured."[64] Generally, "coinsurance provisions require the insured to maintain insurance on covered property in an amount at least equal to a specified percentage."[65] "Failure to do so will make the insured a coinsurer who will bear a proportionate amount of the loss.[66] "The purpose of coinsurance is to reward those who insure at close to full value and to penalize those who insure at less than full value."[67]

Because Landmark transported cargo that was underinsured according to the Policy's terms, the coinsurance penalty applies here. According to the final appraisal, the excavator's value at the date of loss was $397,778.33.[68] The Policy's $100,000 liability limit, therefore, was less than 80% of the cargo's actual cash value, and the coinsurance formula applies as follows:

Step 1: $397,778.33 x 80% = $318,222.66

Step 2: $100,000 ÷ $318,222.66 = 31%

Step 3: $73,103.59 x 31% = $22,662.11

Step 4: $22,662.11 - $10,000 cargo deductible = $12,662.11[69]

In response, Landmark argues that the Policy requires Berkshire to pay full coverage because the Policy's Business Auto Coverage Form states, "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance, or use

---

[64] *Hand Cut Steaks, Inc. v. S. Ins. Co.*, No. 4:16-cv-00531, 2017 WL 5458008, at *2 (E.D. Ark. Nov. 13, 2017) (citing *State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apartments, L.C.*, 572 F.3d 511, 516 (8th Cir. 2009)).
[65] *Wetmore v. Unigard Ins. Co.*, 107 P.3d 123, 125 (Wash. App. 2005).
[66] *Id.*
[67] *Hand Cut Steaks, Inc.*, 2017 WL 5458008, at *2.
[68] Motion ¶ 21.
[69] *See id.* at 10; Policy 59–60 (Section II.D.2 of M-5655 ("Cargo Coverage Form")); Ex. 5 (October 26, 2023 Letter).

of a covered 'auto.'"[70] Granted, it is undisputed that the truck transporting the excavator was a covered auto under the Policy.[71] And as Landmark points out, the Policy states, "We will pay for 'loss' to a covered 'auto' or *its* equipment" where there is a collision caused by "[t]he covered 'auto's' collision with another object."[72] But the excavator is neither a covered auto, nor the covered auto's equipment. Indeed, it was not even Landmark's equipment because Landmark does not own it.[73] Rather, it is cargo—"property of others which is in your custody while loaded for shipment in or on a covered 'auto'"—under the Policy, thus making it subject to conditions in the Cargo Coverage Form.[74] Landmark resists this outcome by claiming that the Policy's statement about paying "all sums" owed by Landmark "supersedes any limitations in its [P]olicy."[75] Yet under Utah law, the Policy is a contract and must be read according to the "basic rule of [contract] construction that the specific controls the general."[76] An insurance policy "begins with a general grant of coverage," but the "exclusions and endorsements included in the Policy then act as a funnel to narrow the Policy's general grant of coverage in certain instances."[77]

Furthermore, it is well-established in Utah law that "insurers 'may exclude from coverage certain losses by using language which clearly and unmistakably communicates to the insured

---

[70] Opp'n 14. *See also* Policy 19 (Policy's Business Auto Coverage Form, Section II.A).

[71] *See* Policy 17.

[72] *Id.* at 23 (emphasis added).

[73] Motion 11; Opp'n ¶ 19.

[74] Policy 28. Berkshire argues for the first time in its reply that there is no liability coverage and no collision coverage because the excavator is not a covered auto under the Policy. *See* Reply 10–12. However, the court declines to address these arguments where Landmark has not had the opportunity to respond to them. *See Esip Series 1, LLC v. Doterra Int'l, LLC*, No. 2:15-cv-00779, 2021 WL 1516010, at *6 (D. Utah Apr. 16, 2021) ("The court is generally reluctant to consider new arguments or positions introduced for the first time . . . where the opposing party is left without a meaningful opportunity to respond.").

[75] Opp'n 17–18.

[76] *Columbia Cas. Co. v. SMI Liquidating, Inc.*, 909 F. Supp. 2d 1303, 1317 (D. Utah 2012).

[77] *Associated Indus. Ins. Co., Inc. v. Ridgewyck Ventures, LLC*, 611 F. Supp. 3d 1272, 1280 (D. Utah 2020).

the specific circumstances under which the expected coverage will not be provided.'"[78] Thus, the

Policy's specific cargo coverage provisions control over the general grant of coverage. As a

result, Landmark's claim that Berkshire is in breach for not paying Landmark $123,610.06 fails.

> **B.       Alleged Failure to Promptly Process the Claim**

Next, Landmark argues Berkshire breached the Policy by failing to promptly process the

claim.[79] Berkshire responds that the undisputed facts show no dilatory action on its part.[80]

Landmark does not establish that the "more than 6 months" it took to repair the excavator

is an unreasonable time under either the Policy or Utah law.[81] Landmark relies on *NetDictation*

*LLC v. Rice* to argue that "[a]n implied reasonable time limit is as much a part of the agreement

as those terms that are expressed, and it has long been recognized that if a contract fails to

specify a time of performance the law implies that it shall be done within a reasonable time

under the circumstances."[82] Notably, though, the court made this observation in the context of

ascertaining whether ambiguity existed in the contract and held that the failure to include a time-

frame provision for performance did not create an ambiguity in the contract.[83] As a result,

*NetDictation* is of limited relevance here where Landmark rejects the notion of ambiguity in the

Policy and argues, instead, that the "plain language of the policy required [Berkshire] to provide

full coverage for the accident and to pay for all sums that [Landmark] was responsible for as a

---

[78] *Id.* (quoting *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1275 (Utah 1993).

[79] Opp'n 13. ("Essentially, the breaches are split into a failure to provide required coverage and a failure to process Landmark Trucking's claim promptly, causing significant losses to [Landmark]."). It is occasionally unclear in Landmark's briefing whether Landmark means to argue both that the prompt processing issue is a breach of contract and that it is a breach of the implied covenant of good faith and fair dealing. Therefore, the court has addressed both.

[80] Def.'s Reply in Support of Def.'s Mot. for Summ. J. ("Reply") 14, ECF No. 31, filed Jan. 22, 2026.

[81] Opp'n 15.

[82] *NetDictation LLC v. Rice,* 2019 UT App 198, ¶ 27, 455 P.3d 625.

[83] *Id.* ¶¶ 20–27.

result of the loss of use of the excavator."[84] And even if *NetDictation* were relevant here, Landmark's argument still fails for lack of evidence that "more than 6 months" is an unreasonable time under the circumstances.

Moreover, Landmark cannot point to language in the Policy that Berkshire violated in processing the claim. Because Landmark has not articulated "which contractual provisions were violated" by how Berkshire processed the claim, Landmark has not established a breach of contract claim on that basis.[85]

## II.    Breach of the Implied Covenant of Good Faith and Fair Dealing

"The Utah Uniform Commercial Code imposes a covenant of good faith for all commercial contracts, and under Utah common law, an implied covenant of good faith and fair dealing generally inheres to all contractual relationships."[86] Under the implied covenant of good faith and fear dealing, "each party promises not to 'intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of a contract.'"[87] And "to comply, a party must act consistently 'with the agreed common purpose and the justified expectations of the other party.'"[88] Applied to insurance contracts, the implied covenant of good faith and fair dealing "contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will

---

[84] Opp'n 14. After reiterating that the Policy's plain language requires full coverage, Landmark adds a conclusory note that "if there is any ambiguity about whether that coverage is extended by the policy, the law requires that the ambiguity be resolved in favor of extending that coverage." *See id.* However, Landmark provides no further analysis of what ambiguity exists.

[85] *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1151 (10th Cir. 2013).

[86] *Rawson v. Conover*, 2001 UT 24, ¶ 44, 20 P.3d 876 (internal citations omitted); Utah Code Ann. § 70A-1a-304; *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991).

[87] *Rawson*, 2001 UT 24, ¶ 44 (quoting *Malibu Inv. Co. v. Sparks*, 2000 UT 30, ¶ 19, 996 P.2d 1043).

[88] *Id.* (quoting *St. Benedict's*, 811 P.2d at 200).

thereafter act promptly and reasonably in rejecting or settling the claim."[89] Although no bright-line rule exists in Utah law for what constitutes a reasonable time for insurers to process a claim, the "Utah Supreme Court has recognized that 'the insurer is entitled to a reasonable time to investigate the facts'"[90] and "that *some* delay necessarily attends claim administration."[91]

Here, Landmark alleges that Berkshire breached the implied covenant of good faith and fair dealing by failing to pay the full amounts owed under the Policies' terms, failing to promptly investigate and process its claim, failing to effectively communicate regarding the claim's status, and failing to timely approve repairs.[92] Berkshire responds that the claim fails because it rests on the same damages as Landmark's breach of contract claim.[93]

"A breach of contract and a breach of duty [of good faith and fair dealing] both give rise to a claim for money damages against the breaching party unless the parties' agreement states otherwise, but damages for breach of contract and breach of duty [of good faith and fair dealing] need not be distinct."[94] In other words, "[r]ecovery under one claim is not limited by or tied to recovery under the other claim."[95] Thus, "damages for breach of contract and for breach of the duty of good faith and fair dealing 'may be similar or even identical.'"[96]

---

[89] *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985).

[90] *Owners Ins. Co. v. Dockstader*, No. 2:18-cv-173, 2019 WL 1206886, at *5 (D. Utah Mar. 14, 2019) (quoting *State Farm Mut. Auto. Ins. v. Kay*, 487 P.2d 852, 855 (Utah 1971)).

[91] *Blakely v. USAA Cas. Ins. Co.*, 691 Fed. App'x 526, 535 (10th Cir. 2017) (quoting *Machan v. UNUM Life Ins. Co. of Am.*, 116 P.3d 342, 347 (Utah 2005)).

[92] Opp'n 13; Motion 9.

[93] Motion 14–16.

[94] *Taylor v. State Farm Fire & Cas. Co.*, No. 1:22-cv-00101, 2024 WL 4043535, at *4 (D. Utah Sept. 4, 2024).

[95] *Id.* (quoting *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 23, 94 P.3d 193). *See also Olé Mexican Foods Inc. v. J. & W. Dist. LLC*, 2024 UT App 67, ¶ 34, 549 P.3d 663 (holding that a jury verdict that found no breach of contract while finding liability for breach of the implied covenant of good faith and fair dealing was not inconsistent).

[96] *Healy-Petrik v. State Farm Fire & Cas. Co.*, 2:20-cv-00611, 2022 WL 464220, at *6 (D. Utah Feb. 15, 2022) (quoting *Braun v. Medtronic Sofamor Danek, Inc.*, 141 F. Supp. 3d 1177, 1187–88 (D. Utah 2015), *aff'd*, 719 Fed. App'x 782 (10th Cir. 2017).

Turning to the merits of the good faith and fear dealing claim, the court considers whether a reasonable juror could conclude that Berkshire's conduct violated its duties under the implied covenant.[97] Berkshire began the process of obtaining appraisals and values related to the excavator's damage from an independent adjuster on July 20, 2023, the day after the incident.[98] On August 21, 2023, Berkshire received the independent adjuster's initial report.[99] On October 10, 2023, Berkshire received the police report and an email from UDOT regarding the bridge.[100] Seven days later, State Farm reached out to Berkshire with details about its covered vehicle's damage.[101] On October 19, 2023, Berkshire obtained a final appraisal to repair the excavator at an estimated cost of $73,103.59.[102] The following week, Berkshire obtained a market survey valuation of the excavator and notified Landmark that the coinsurance penalty applied and the available coverage was $12,662.11.[103] Berkshire then emailed an offer to Mammoth for $12,662.11 on November 14, 2023, and notified Landmark of the offer.[104] When Berkshire learned that Landmark had paid Mammoth for the excavator's damages, it sent the $12,662.11 to Landmark.[105]

---

[97] *Taylor*, 2024 WL 4043535, at *3 (determining that "[t]he test of the insurer's conduct is one of reasonableness") (quoting *Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130, 138 (Utah Ct. App. 1992)); *see also Andersen v. Foremost Ins. Co.*, No. 1:20-cv-115, 2021 WL 6087694, at *3 (D. Utah Dec. 23, 2021) ("[T]he implied covenant imposes a duty on first-party insurers to act in an objectively reasonable manner in handling an insured's claim.") (citation omitted).

[98] Motion ¶¶ 17–21.

[99] Ex. 4 at 87.

[100] *Id.*

[101] *Id.* at 86–87.

[102] *Id.*

[103] Motion ¶ 22; Policy 17. *See also* Ex. 5 (October 26, 2023 Letter) ("The claim presented is $73,103.59. You are required to carry 80% of the value of the load or $318,222.66. Taking the amount you carried ($100,000) divided by the amount required ($318,222.66) is 31% of value. Therefore, applying 31% of the damages presented we would owe $22,662.11 less than the applicable cargo deductible of $10,000 or $12,662.11.").

[104] Motion ¶¶ 23–24; Ex. 4 at 84.

[105] Motion ¶¶ 26–30.

Landmark faults Berkshire for the two-month period "where almost nothing happen[ed] to advance the claim" and argues it constitutes a breach of the implied covenant of good faith.[106] However, the record belies Landmark's argument. The two-month period Landmark alludes to— from August and October of 2023—represents how long Berkshire had to wait for information it needed from the multiple parties involved.[107] The independent adjuster Berkshire had promptly hired the day after the accident provided an initial report in August, but Berkshire was missing the reports from the police, UDOT, and State Farm. Thus, Landmark's claim of a two-month delay is contradicted by the record.

Landmark also argues that Berkshire violated the implied covenant of good faith by allegedly not allowing Landmark to repair the excavator for six months.[108] Even if this were a cognizable argument, it is unsupported by the record. Landmark's only evidence for it is a vague statement in the declaration of Jason Bennett, Landmark's principal, that "Berkshire Hathaway and Hanover did not authorize [Landmark] to repair the excavator until towards the end of January 2024 . . . . Prior to permitting the repair, Berkshire Hathaway had asked Landmark Trucking to preserve the excavator . . . ."[109] This bare statement about an alleged communication—completely devoid of who was involved, when it occurred, or how it was conveyed—does not create a genuine issue of material fact. Even if this oblique communication between unidentified persons through unknown means at an unspecified time occurred, Landmark does not point to any evidence of what earlier date would have been appropriate for the excavator to be repaired. To find for Landmark, a jury would be required to speculate.

---

[106] Opp'n 15.
[107] *Id.* (referencing Ex. 4 at 86–88).
[108] *Id.*
[109] Decl. of Jason Bennett ("Bennett Decl.") ¶ 2, ECF 23-1, filed Dec. 26, 2025.

Under these facts, Berkshire's conduct in processing the claim and communicating with the parties passes the "reasonableness" test.[110] Accordingly, the implied covenant of good faith claim fails as a matter of law.

### III.   Contract Reformation

Landmark also asserts a contract reformation claim on the basis of mutual mistake or, alternatively, unilateral mistake.[111]

"Utah law is clear that a mutual mistake of fact can provide the basis for equitable rescission *or reformation* of a contract even when the contract appears on its face to be a complete and binding integrated agreement." [112] "A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain, and subsequently fail to reduce their actual intent to writing."[113] In other words, mutual mistake "warrants the reformation" of a contract where, among other things, "the instrument as made failed to conform to what the parties intended."[114] "The proponent of a mutual-mistake claim must prove the elements by clear and convincing evidence."[115]

Similarly, a unilateral mistake may be a basis for reformation of a contract if the movant shows "that the instrument as made failed to conform to what *both parties* intended," or "that the claiming party was mistaken as to its actual content and the other party, knowing of this mistake,

---

[110] *Taylor*, 2024 WL 4043535, at *3. *See also Owners Ins. Co.*, 2019 WL 1206886, at *5 (granting summary judgment to insurer because "there is no evidence in this case that [insurer] acted unseasonably"). Landmark's failure to pay the "full amounts due" argument is addressed earlier.

[111] Compl. ¶¶ 42–45.

[112] *E & H Land, Ltd. v. Farmington City*, 2014 UT App 237, ¶ 25, 336 P.3d 1077 (emphasis supplied) (internal quotation marks and citation omitted).

[113] *Id.* (quoting *Burningham v. Westgate Resorts, Ltd.*, 2013 UT App 244, ¶ 12, 317 P.3d 445) (also quoting *F.D.I.C. v. Taylor*, 2011 UT App 416, ¶ 47, 267 P.3d 949).

[114] *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 19, 48 P.3d 941 (internal quotation marks and citation omitted).

[115] *High Desert Estates LLC v. Arnett*, 2015 UT App 196, ¶ 11, 357 P.3d 7.

kept silent," or "that the claiming party was mistaken as to actual content because of fraudulent affirmative behavior."[116]

As discussed above, insurance policies are "subject to the general rules of contract construction." [117] Those rules provide that "the parties to an insurance policy are free to define the exact scope of the policy's coverage and may specify the losses or encumbrances the policy is intended to encompass."[118] An insurer's "right to contract with an insured as to the risks it will or will not assume, as long as neither statutory law nor public policy is violated," means that "an insurer may include in a policy any number or kind of exceptions and limitations to which an insured will agree unless contrary to statute or public policy."[119]

Here, Landmark's contract reformation claim fails as a matter of law because Landmark has not established by clear and convincing evidence either a mutual or unilateral mistake to merit reformation.[120] Both theories rely on establishing intent, but Landmark's evidence of intent falls short.[121] Landmark claims that both parties "reasonably believed that the insurance contracts provided coverage for all damages resulting from covered events."[122] For support, Landmark offers Mr. Bennett's declaration in which he states that in selecting the policy, "it was discussed" that Landmark regularly transported construction materials and equipment, and

---

[116] *Guardian State Bank v. Stangl*, 778 P.2d 1, 6 (Utah 1989) (emphasis supplied) (citation omitted).
[117] *S.W. Energy Corp. v. Cont'l Ins. Co.*, 1999 UT 23, ¶ 12, 974 P.2d 1239.
[118] *Village Inn Apartments v. State Farm Fire & Cas. Co.*, 790 P.2d 581, 583 (Utah Ct. App. 1990) (internal quotation marks and citation omitted).
[119] *Farmers Ins. Exchange v. Call*, 712 P.2d 231, 233 (Utah 1985).
[120] *See High Desert Estates LLC*, 2015 UT App 196, ¶ 11.
[121] *See, e.g.*, *Allegis Inv. Servs., LLC v. Arthur J. Gallagher & Co.*, 371 F. Supp. 3d 983, 1007 (D. Utah 2019) ("Under a unilateral mistake, reformation is appropriate when one party's mistake 'is coupled with knowledge of the mistake by the other party or a mistake is produced by fraud or other inequitable conduct by the non-erring party.") (quoting *Guardian State Bank v. Stangl*, 778 P.2d 1, 5 (Utah 1989)).
[122] Compl. ¶ 44; Motion 17.

Landmark believed that was "the type of activity the policy was anticipated to cover."[123] Mr. Bennett also avers that "it was clear to Landmark" that Berkshire would "pay all sums [Landmark] must pay as damages . . . caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"[124] Be that as it may, this evidence does not show that Berkshire "share[d] a misconception about a basic assumption or vital fact" such as the type of coverage available in the Policy.[125]

Furthermore, Landmark has not established that the Policy is ambiguous. At most, Landmark argues that "the policy is long, complex, and multi-parted."[126] However, "complicated is not equivalent to ambiguous."[127] And when ambiguity has not been established, "[t]he best indication of the parties' intent is the language they chose to use in the contract."[128] Indeed, Utah law clearly states that "if the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language."[129] For this reason, courts "will not rewrite an unambiguous contract" to fit the parties' claimed intentions.[130] Thus, extrinsic evidence cannot supplant the plain language of the unambiguous Policy here, regardless of its complexity.

Moreover, as discussed earlier, the Policy contains limitations on coverage, such as the coinsurance provision and the limit on loss mitigation costs, that "act as a funnel to narrow the

---

[123] Bennett Decl. ¶ 3.

[124] *Id.* ¶ 7.

[125] *E & H Land, Ltd.*, 2014 UT App 237, ¶ 25 (internal quotation marks and citation omitted).

[126] Opp'n 20.

[127] *Russell v. Mass. Mut. Life Ins. Co.*, 4:24-cv-00098, 2026 WL 483193, at *8 (D. Utah Feb. 20, 2026).

[128] *Regal RealSource LLC v. Enlaw LLC*, 2024 UT App 95, ¶ 20, 554 P.3d 1112 (quoting *Compton*, 2017 UT 17, ¶ 17).

[129] *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 14, 140 P.3d 1210 (quoting *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 21, 133 P.3d 428).

[130] *Zions Mgmt. Servs. v. Record*, 2013 UT 36, ¶ 32, 305 P.3d 1062 (quoting *Provo City Corp. v. Nielson Scott Co.*, 603 P.2d 803, 806 (Utah 1979)).

Policy's general grant of coverage in certain instances."[131] In fact, the Policy itself states that "[v]arious provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered."[132] "And under Utah law, 'each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it.'"[133] Finally, Landmark presents no evidence that Berkshire "fraudulently induced" Landmark into believing the Policy contained no limitations on coverage, particularly when the Policy itself says otherwise.[134] Therefore, Landmark has not established by clear and convincing evidence either mutual or unilateral mistake.

In sum, because the undisputed facts do not satisfy the criteria for reformation under Utah law, Berkshire is entitled to summary judgment on the contract reformation claim.

## ORDER

Accordingly, the court GRANTS Defendant's Motion for Summary Judgment.[135]

Signed May 1, 2026.

BY THE COURT

_____

David Barlow
United States District Judge

---

[131] *Associated Indus. Ins. Co., Inc.*, 611 F. Supp. 3d at 1280.
[132] Policy 55.
[133] *Mackley v. Openshaw*, 2019 UT 74, ¶ 38, 456 P.3d 742 (quoting *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1208 (Utah 1987).
[134] *Allegis Inv. Servs., LLC*, 371 F. Supp. 3d at 1008.
[135] ECF No. 19.